MECHANICS' & METALS' NAT. BANK et al. v. HOWELL.

(District Court, D. Connecticut.   July 24, 1913.)

1. JUDGMENT (§ 710*)—CONCLUSIVENESS—PERSONS BOUND—CONSENT DECREE.

A consent decree under which the property of a corporation is sold to a creditors' committee as a step in carrying out a plan of reorganization cannot cut off or affect the rights of one not a party nor brought under its operation by consent or otherwise.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. § 710.*]

2. CORPORATIONS (§ 579*)—REORGANIZATION—VALUATION OF PROPERTY—RIGHTS OF PARTICIPATING CREDITORS AGAINST INDORSER.

Defendant, in proceedings in involuntary bankruptcy, was a stockholder and officer of a large manufacturing corporation and with its president had indorsed some of its notes which were outstanding when receivers were appointed for the company in a creditors' suit.   A committee was appointed under an agreement of creditors with authority to formulate and submit to the creditors depositing their claims a plan of reorganization or other plan of settlement, and defendant and the other indorser signed an agreement waiving demand and notice, etc., and consenting that any extension might be given to the company without impairing the obligations of the indorsers.   On the report of experts that the value of the company's property as it stood was less than the indebtedness, but that as a going concern, properly financed and managed, it would be worth much more and the business could be made profitable, the committee submitted a plan of reorganization which was accepted and carried out as follows:   The committee purchased the property from the receivers at private sale, which was confirmed practically without objection, for $870,000, receiving also a confirmatory deed from the corporation; the committee conveyed the property, with a sum of money for working capital, to a new corporation and received in payment all of the common and preferred stock, amounting to $4,725,000, the minutes of the transaction reciting that the property received was worth the full par value of the stock, to conform to a law of the state; each creditor was given common and preferred stock equal at par value to the amount of his claim with an agreement that his right against any indorser should not be affected thereby.   Defendant was not a party to the suit, took no part in the reorganization, and waived no rights except to the extent stated.   Held, that the sale of the property to the committee, confirmed by consent decree, was merely a step in the reorganization plan, and that the price paid did not fix its value as against defendant, but, as between him and the creditors participating in the reorganization, its value was that placed upon it by the new corporation on the basis of which its stock was issued; that the indorsement creditors, having received and accepted full payment of their claims in such stock, had no further claim against the indorsers and could not maintain a petition in bankruptcy against defendant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2307, 2309, 2313–2318; Dec. Dig. § 579.*]

In the matter of George D. Howell, alleged bankrupt.   On involuntary petition by Mechanics' & Metals' National Bank and others. Petition dismissed.

The petitioners allege the insolvency of the respondent and his liability as an indorser of the notes which they severally hold.

The McCrum-Howell Company was a corporation, organized under the laws of Connecticut but having the largest amount of its property and assets in

Pennsylvania. The capital stock was $7,000,000, half preferred, half common. It carried on a large business in the manufacture and sale of boilers, radiators, enameled iron ware, vacuum and suction cleaners, and transom lifts. Lloyd G. McCrum was its president and George D. Howell was a director and its vice president. Both were accommodation indorsers of the company's commercial paper.

On March 13, 1912, a bill in equity was filed by a stockholder praying for the appointment of a receiver to take possession of the properties of the company in order to conserve its assets. To this bill the company filed its answer, verified by respondent, and the court appointed two receivers, both concededly able men of large affairs. Ancillary decrees appointing the same receivers in other jurisdictions were made in due course.

On the same day that these receivers were appointed (March 13, 1912), Howell and McCrum transferred and delivered certain personal property and certain deeds to real property to one Oscar L. Telling, then president of a bank in Pittsburg, taking from Telling a receipt to the terms of which they agreed, which reads in part as follows: "In trust, however, to hold the same; * * * to collect the rents, issues and profits thereof; * * * to sell and dispose of the same at public or private sale; * * * and from time to time to promptly, as the same are received, to distribute the proceeds thereof ratably and proportionately, and upon a basis of equality, to the debts of said Howell and McCrum, and renewals thereof, a schedule of which denominated Schedule B is attached hereto, but in addition to the debts in Schedule B, to make distribution cover all of their contingent liabilities as soon as said contingent liabilities become absolute from or by reason of their indorsement on the obligations of the McCrum-Howell Company and the Richmond Sales Company, and upon such other contracts as upon which they may be at this time liable. * * * *" This transfer to Telling is asserted by petitioners to be a general assignment and to constitute the act of bankruptcy upon which petitioners now seek to have Howell adjudicated a bankrupt.

On April 10, 1912, a creditors' committee was created (hereinafter called for brevity the Wiggin committee) and a "creditors' agreement" prepared. This agreement had the familiar provisions for depositing claims, for appointing a depositary, and for authorizing the committee to act as attorney and agent. The "fourth" and "eleventh" paragraphs are especially important in this connection. They are:

"Fourth. The committee is authorized and requested to formulate a plan and agreement for the reorganization of the company or of any of its subsidiary companies or the readjustment of its or their obligations and the discharge of said receivers, or in the discretion of the committee, to collect, compromise or otherwise adjust the claims without. a reorganization. In the event the committee formulates a plan and agreement for reorganization, printed copies of such plan and agreement shall be filed with the depositary and notice of such filing published * * * and mailed to each depositor. * * * Holders of certificates of deposit hereunder who shall not assent to such plan and agreement, if any is formulated, may at any time before a date to be specified in such notice * * * surrender such certificates and withdraw their deposited claims on payment of their pro rata share. * * * All holders of certificates of deposit not so withdrawing shall be bound by such plan and agreement with like effect as if they had executed the same."

"Eleventh. The depositors do not assign to the committee any claim against any party other than the company, and do not waive or release any rights or claims against any indorser or guarantor of or person otherwise secondarily liable upon any of the claims deposited hereunder."

At the foot of this paper and following the signatures of the committee and the depositary, McCrum and Howell signed the following:

"Lloyd G. McCrum and George D. Howell, indorsers upon certain of the obligations of the McCrum-Howell Company, execute this agreement, severally assenting to the terms hereof, and hereby waive demand of payment, protest and notice of protest of any of the notes of the company indorsed by them,

and consent and agree that any extension of time of payment of any of the notes of the company indorsed by them, or either of them, may be given by the holders of any of such notes without impairing the obligations of the indorsers or the right of recourse against them by the holders of such notes.

"Lloyd G. McCrum. (L. S.)
"George D. Howell. (L. S.)"

Under date of April 24, 1912, the receivers made a preliminary report in which they set forth that they had employed Gunn, Richards & Co., a disinterested and responsible firm of auditors and engineers, to examine the property and estimate its value. The receivers pointed out the desirability of prosecuting the business vigorously and, to that end, of being authorized to make the necessary and appropriate arrangements. They annexed to and made part of their report an "approximate statement of assets and liabilities of the McCrum-Howell Company as of March 14, 1912." Exclusive of patents, patent rights, trade-marks, and good will (in respect of which no figures were given), the assets were estimated at $2,662,957.88 and the excess of assets over liabilities (exclusive of contingent liabilities, capital stock, and disputed claims) was put at $85,928.03.

On or about May 14, 1912, Mr. W. E. S. Strong, presumably a capable expert, undertook a scientific investigation for the receivers, at the request of the Wiggin committee, and reported at considerable length under date of July 16, 1912, detailing the good and bad features of the company's plants and management.

On August 19, 1912, Mr. Strong wrote the receivers stating that in his opinion the plants were carefully appraised but for reasons stated he recommended a deduction of $117,308.91 from the appraisal of Gunn, Richards & Co. He also recommended the deduction of $75,369.43 to cover shrinkages of materials.

On or about September 9, 1912, the Wiggin committee filed a cross-bill of which they made the creditors' agreement of April 10, 1912, a part. In the cross-bill it was alleged, among other things, that the Wiggin committee was "authorized to prepare and put into effect a plan of reorganization of the McCrum-Howell Company." The bill further set forth that the corporation was insolvent and that investigation by the receivers since their report of April 24, 1912, showed that the full value of the assets would not exceed the sum of $2,400,000 appraised as a going concern. Three days later, to wit, on September 12, 1912, a circular was prepared by the Wiggin committee, addressed to the creditors of the company, in which it was stated that the committee had prepared and would submit shortly a plan of reorganization. It was further announced in the circular that sufficient stock of the new company had been underwritten to provide necessary working capital and to pay the expenses of the receivership and reorganization, and that the announcement made in the circular was for the purpose of correcting a statement in certain newspapers that it was intended to dispose of the assets of the company and that no reorganization would be had. "The petition," continued the circular, "filed by the committee in the United States District Court at Philadelphia was for the purpose of facilitating the reorganization."

Up to this time, so far as the record discloses, Howell had not signed any instrument since April 10, 1912, and had had no communication, verbal or written, in relation to his transfer to Telling or his liability as an indorser except a letter dated April 29, 1912, written to the president of the Corn Exchange National Bank of Philadelphia, in which he explained the transfer to Telling, by McCrum and himself, saying: "We are in hopes that the company will pay its debts. If not, you and all its creditors will share in this property (meaning McCrum's and his) without preference. We did this to back up our indorsements if we were to be held ultimately."

Under date of September 16, 1912, the receivers wrote to the Wiggin committee (the letter being printed evidently for circulation) and recapitulated various statements and reports made from time to time in regard to the business and condition of the company. Revising the assets as of September 1, 1912, they made the total, exclusive of patents, patent rights, trade-marks and good will, $2,179,361.02. Excluding certain contingent liabilities,

they figured the total· liabilities as $2,606,265.68. On this estimate the excess of liabilities over assets was $426,904.66, but they did not undertake "to put a value on patents, patent rights, trade-marks, or good will." They· called attention to the fact that they had effected an arrangement with the owners of one patent which might result in the company receiving a substantial income each year during the life of the patent, in addition to the profit that might be realized in the manufacture and sale of stationary vacuum cleaners. They pointed out that: "A forced sale of the assets would probably be attended by very great shrinkage and loss. The only other alternative appears to be the reorganization of the company or the formation of a new company by creditors and stockholders to take over the business. By accepting, in settlement, securities of a properly organized and managed company, with sufficient capital, the creditors can realize whatever value the business has as a going and income producing business." They then went on to say that, in order to aid creditors and stockholders in deciding upon the proper course to pursue, they caused estimates of probable earnings to be made on the assumption that the business would be continued under a competent management and with adequate working capital. They informed the Wiggin committee (and doubtless through them the creditors) that Messrs. Gunn, Richards & Co. in a report rendered April 27, 1912, expressed the opinion that net profits of $330,000 per annum could be realized on the basis of certain sales after certain deductions; that Mr. Strong, on a somewhat different basis of figuring, estimated possible net profits of approximately $210,000 a year increasing to $320,000; and they expressed the opinion that from $800,000 to $850,000 would be sufficient additional capital if the new company could readily negotiate loans in amounts necessary for a season's operations and other purposes. They concluded: "It may not be out of place, however, to say that in our judgment the business has sufficient value and prospects to justify an attempt to save and realize this value by the reorganization of the company or the formation of a new company."

On or about September 18, 1912, Mr. Howell had a conversation with Wiggin in which he proposed to Mr. Wiggin a plan of reorganization that did not meet with·Mr. Wiggin's approval. In this conversation Mr. Wiggin in substance said that Howell had not figured in his plan on the personal indorsements which Wiggin thought would be 25 or 30 per cent., to which Mr. Howell replied that he thought Mr. Wiggin was "putting it too high."

On September 27, 1912, the Wiggin committee promulgated a "plan and agreement for reorganization," and also on the same date prepared a circular to the creditors. This circular stated, among other things: "The investigations made by the committee have convinced it that, if the property be disposed of at a forced sale, the creditors can realize but a small percentage of their claims. The business, however, appears from the reports of the engineers and accountants to have an earning power. Mr. Strong estimates the earnings, after making certain improvements, at $209,000 a year with a gradual increase until the profits will equal $300,000. Others name higher figures." The circular called attention to the plan of reorganization adopted by the Wiggin committee, copy of which accompanied the circular, and the essential details of which were summarized in the circular, as follows:

"The creditors' committee proposes to purchase at a judicial sale all, or such portion thereof as may appear desirable, of the assets of the McCrum-Howell property, and in turn to transfer such assets to a new corporation in exchange for $1,575,000 of preferred stock of the company and $3,150,000 of common stock; all of the stock of the new company to be placed in a voting trust for five years. The creditors of the McCrum-Howell Company are to receive voting trust certificates for preferred stock of the new company in an amount equal to 25 per cent. and voting trust certificates for common stock of the new company in an amount equal to 75 per cent. of their claims. The noteholders reserve all of their rights against the individual indorsers of the company's paper. To furnish working capital necessary for the new company, and to pay the expenses of receivership and reorganization, it is proposed to permit the present stockholders of the McCrum-Howell Company to subscribe for, or if they fail to do so, to sell $875,000 of the pre-

ferred stock of the new company, carrying with it a similar amount of common stock. This amount of stock has been underwritten and the underwriters will receive a cash commission for their services."

The plan and agreement for reorganization dated September 27, 1912, need not be set forth at length because its purport is concisely and clearly stated in the circular just referred to. From this plan it appeared that the liability of the company (exclusive of stock liability) was estimated at approximately $2,800,000; that the new company was to acquire the property of the McCrum-Howell Company at judicial sale; that the new company was to have an authorized capital of $4,725,000, of which $1,575,000 was to be cumulative preferred and the remainder common stock, all of the par value of $100 per share; and that the holders of McCrum-Howell stock were to be permitted to subscribe at so much per share to provide "for the expenses and other purposes of the reorganization, including the expenses of receivership, and to supply the new company with additional working capital." It further appeared that the $875,000 of preferred stock, together with the equal amount of common stock, to which "the present stockholders are entitled to subscribe," had been underwritten by a syndicate.

"For the cash to be furnished and the property which the new company will acquire, pursuant to the plan, the new company is to issue and deliver the following:

"$1,575,000 par value preferred stock.
"$3,150,000 common stock.

| | |
|---|---|
| New 7 per cent. cumulative preferred stock authorized.... | $1,575,000 |
| To the stockholders participating or to the underwriters.. | $ 875,000 |
| To the creditors 25 per cent. of the face of the claims, or to be used for purposes approved by the committee..... | 700,000 |
| | $1,575,000 |
| Common stock, authorized............................ | $3,150,000 |
| (a) To the creditors for 75 per cent. of their claims, or for purposes approved by the committee................... | $2,275,000 |
| (b) To old stockholders participating in plan (or to underwriters) 100 per cent. of par of new preferred stock.... | 875,000 |
| | $3,150,000" |

Under paragraph 7 of this plan of reorganization was set forth the following:

"Result to Creditors of the McCrum-Howell Company.

"Creditors will receive:
"(a) 25 per cent. of face of claims in new preferred stock.
"(b) 75 per cent. in new common stock.
"Noteholders holding indorsements do not surrender same but retain their respective claims against indorsers."

On October 1, 1912, Mr. Howell wrote to Mr. Wiggin, inclosing a proposed plan of reorganization. On October 7, 1912, Mr. Wiggin wrote Mr. Howell disapproving the plan and pointing out what he regarded as its defects, and concluding: "You must also bear in mind that the committee is placing a valuation on the individual indorsements which does not seem to be properly cared for in your suggested plan."

On October 21, 1912, Judge McPherson, sitting in the District Court for the Eastern District of Pennsylvania, made an order setting November 2, 1912, as the time for the hearing of a motion on the part of the petitioning creditors for a decree of sale of the assets of the McCrum-Howell Company. Under date of November 1, 1912, the Wiggin committee addressed the receivers, offering to buy the assets of the company for $870,000 in cash, conditioned,

among other things, upon the committee or its nominee receiving a confirmatory deed and other instruments authorized by the stockholders and directors of the McCrum-Howell Company at a meeting or meetings properly called and held for that purpose. The committee proposed that it should be permitted to apply on account of the purchase price the dividend to which it was entitled on account of the claims assigned to it by various creditors, amounting to $2,098,947. This was the bid which, with other things, was the subject-matter of discussion when the motion came on before Judge Buffington on November 2, 1912. There was considerable discussion on that occasion, and the attention of the court was called to the plan and agreement of reorganization, and it was made clear that all who desired to participate would have the opportunity so to do upon an equal footing. The sole objection to the proposed procedure came from the Corrigan, McKinney & Co. of Cleveland, whose attorney said that he was not in a position to state any specific objection and asked only that an objection be placed on the record to protect the rights of his client in the future. Largely because of this objection, and doubtless to some extent because of the natural caution of the court in desiring to give full opportunity to all who might wish to be heard, a decree nisi was made which provided that the bid of the Wiggin committee be accepted and approved unless on or before November 13, 1912, "there shall have been presented to the court such high bid or *such other plan* as may be approved by the court, * * * and that, in the event that there is no other such bid or plan so received and approved by the court, the court will at such time enter a final decree approving the bid * * * and directing a conveyance of the property by the receiver to such purchaser or its nominee." It was further ordered that "a meeting of the directors and stockholders of the McCrum-Howell Company be called in the method provided for by its by-laws or by-law for the purpose of voting upon the question of whether the said company will make the necessary confirmatory deeds of sale or other instruments that may be necessary to vest in the purchaser, if said bid is accepted by this court, the legal title to said property, so far as said action of said corporation may be necessary."

On November 4, 1912, the receivers sent a letter to creditors, stockholders, and all persons claiming to be interested in the company, notifying them of the decree nisi and the action of the court accepting the bid unless there should be presented a higher bid or some other plan or method of sale.

Under date of November 13, 1912, a final decree was made the only opposition (if such it may be called), being that of Messrs. Corrigan, McKinney & Co., who, as the order recited, stated that they had no objection to a decree directing a private sale of the assets, but "who desired to be considered as making a formal objection to the entry of the proposed decree on the ground of inadequacy of price, but who did not desire to submit any evidence in opposition thereof, and who did not request any further time in which to offer such evidence."

Among other things, it was decreed that no creditor, stockholder, or other person "has presented another or other bid or has suggested any other plan or method of sale," and finally the nisi decree was made absolute. Mr. Howell was not present at this meeting, nor was his appearance noted or recited in any order or in any part of the proceedings either on November 2d or November 13th.

The Richmond Radiator Company of Delaware was the reorganized company. Its first meeting was held on November 25, 1912, and the usual proceedings were had. The offer of the Wiggin committee to sell all of the assets of the McCrum-Howell Company and to pay $340,000 for the issue to it of the full preferred and common stock of the Richmond Radiator Company was duly accepted, and, in accordance with the laws of the state of Delaware, the property thus turned over by the Wiggin committee was declared to be of the actual value of the stock issued therefor, to wit, $4,725,000. The Richmond Radiator Company thus became the owner of all of the assets of the McCrum-Howell Company, and the plan and agreement of reorganization were approved and carried out to the letter. In due course the receivers made their report to the court, and, after deduction for expenses, it was

found that the $870,000 produced a dividend of 21.2 per cent. It is now claimed by the petitioners that Howell, as an indorser, is liable for the remaining 78.8 per cent.

Finally it is to be remembered that, in the testimony given by Mr. Wiggin, it affirmatively appears that $870,000 was not the value of the property based upon any estimate or appraisal or on any other measure of value. That figure was arrived at as the amount necessary to raise in order to pay the expenses of the receivership, provide working capital for the reorganized company, and, according to Mr. Wiggin, "to be able to present to those banks (the 'country' banks), that were not willing to go along and take securities, some alternative cash offer." While the Wiggin committee would have preferred to have had $900,000 or $1,000,000, it seems that this was all that could be raised or for which assurance could be obtained from the underwriting syndicate.

White & Case, of New York City (Joseph M. Hartfield, James N. Rosenberg, and Irving S. Olds, all of New York City, of counsel), for petitioners.

William F. Henney, of Hartford, Conn., and William E. Curtis, Henry A. Stickney, and Philip J. McCook, all of New York City, for respondent.

MAYER, District Judge (after stating the facts as above). The number of writings in evidence and their considerable detail have made necessary the foregoing extended statement.

The petitioners insist that $870,000 was the value of the assets sold; that the respondent in effect gave his consent to the decree by his writing of April 10, 1912, and by his subsequent conduct. The respondent, with equal insistence, contends that the sale of November 2 and 13, 1912, was merely a step in a reorganization, and that the true value of the property was that which the depositing creditors themselves placed on the property in their organization of the Richmond Radiator Company and the declaration as to the value of the stock issued. Other propositions are advanced but these lie at the bottom of the controversy.

It is plain beyond controversy that the $870,000 bid at the sale in the court in Pennsylvania was not any test of the value of the property and was simply a step in the plan of reorganization. The course taken by the Wiggin committee was the only feasible and practical solution of a difficult situation.

To sell the property disassociated from a plan of reorganization, stripped of its organization, its mechanics and salesmen scattered and its plants shut down, would have been to sacrifice it as scrap. Such a disposition was not to be expected of the experienced men who constituted the Wiggin committee, and this they, as well as the receivers, made clear to the creditors in the circulars explaining the desirability of coming into the reorganization plan. The problem was not an unusual one.

In the busy jurisdictions, the question is constantly presented of selling a business as a going concern or letting it go under the hammer as so much land or merchandise. Even though the liabilities exceed the assets, substantial value may be attained with the addition of working capital and good management. That was the case here,

as everybody realized and as the expert Strong (selected by the receivers at the request of the Wiggin committee) in due time reported.

It is said, however, that the $870,000 must be accepted as the purchase price; that so the decree of the court in Pennsylvania declares; and that to place any other construction on the decree is to attack it collaterally. It is true that for some purposes and between certain parties $870,000 must be regarded as the price of the property. For instance, the Wiggin committee and the receivers are, as to each other, 'bound by the decree, as it reads on its face, on the same principle as would be bondholders and stockholders under a reorganization contract as discussed in Northern Pacific Railway v. Boyd, 228 U. S. at page 502, 33 Sup. Ct. 554, 57 L. Ed. 931, or as would be consenting parties to a judicial sale accomplished by a consent decree.

[1] But, if the decree be a consent decree and obviously an instrument in a plan of reorganization, it cannot cut off nor impair the rights of one who was not brought under its operation, either individually or through some other acting for him in a representative capacity and who has neither waived nor otherwise, in legal effect, foregone his rights.

[2] What was the status of Howell as an indorser after the reorganization had been effected? In conjunction with McCrum he had transferred certain property in March, 1912, in trust to apply to his and their debts if ultimately necessary; this done at a time when no one could foresee the results to come. Next he waived demand of payment, protest, and notice of protest of any of the company notes indorsed by him and consented that the holders might extend time of payment without impairment of his obligation to them as indorser. It is contended by Howell that this is all he did; but such a construction would put a highly technical meaning on the McCrum-Howell addendum to the agreement of April 10, 1912; and his letter of April 29, 1912, to Mr. Calwell (although referring only to the Telling transfer) is illuminating as to his mental attitude, and that mental attitude discloses his own practical construction negativing the meaning now contended for. The addendum clearly consents to everything in the agreement.

Paragraphs cannot, however, be isolated. The agreement must be read as a whole, and, so read (omitting the usual formal provisions), paragraphs fourth and eleventh bear an important relation to each other. Concededly the claims against the maker could not be assigned and the rights against the indorser reserved without impairing the obligation of the indorser in the absence of the latter's consent. Spies v. National City Bank, 174 N. Y. 222, 66 N. E. 736, 61 L. R. A. 193. To have sued and obtained judgment against the indorsers at that time for the principal of the debt might inadvisedly have opened up complications, legal and practical. The intent of the agreement, therefore, was to exhaust first the estate of the principal debtor, meanwhile preserving any rights against those secondarily liable.

Paragraph fourth empowered the Wiggin committee to choose between alternatives (1) to formulate a reorganization plan and agreement, or (2) to collect, compromise, or otherwise adjust the claims without a reorganization. Until the committee determined which alternative to select, it was impossible to fix the basis of the secondary liability.

If the property went to absolute public sale without a reorganization plan, the decree of the court would fix the purchase price in the first instance, and after that, in due course, the dividend and the indorser under paragraph eleventh (consented to by the addendum) would be held for the balance. If the committee formulated a reorganization plan and agreement and filed and published the same as required under paragraph fourth, all depositors not dissenting were to be bound by such plan and agreement. In such event, a judicial sale might and probably would be a mere step to the final result, more especially if the sale price were an arbitrary figure designated by the committee, not fixing value as between assenting depositors and the indorsers but necessary to the termination of the receivership, to divesting the receivers of such right, title, or possession as they might have, and to furnishing a winding up fund for the purposes of the receivership.

As between the assenting creditors and the indorsers, however, the secondary liability could only be determined after the true value of the property had been ascertained, because clearly such a reorganization contemplated a valuation of the res for reorganization purposes as a going concern as distinguished from a purchase price after competitive bidding or an arbitrary figure in a judicial decree decided on without relation to the value of the property but as a necessary incident to the process of reorganization. That such was the view which must be attributed to the Wiggin committee (and, of course, its depositors) and to Howell is well confirmed by the situation.

Why should the creditors in April, 1912, delay suing the indorsers unless they wished first to ascertain the ultimate result? At that time the outlook was by no means gloomy, and Gunn, Richards & Co. were already estimating and appraising on a basis which shortly thereafter justified the receivers in reporting a probable surplus for creditors exclusive of patents, patent rights, trade-marks, and good will. A successful reorganization might mean a hundred cents on the dollar, a consummation equally desired by creditor and indorser.

Having given the Wiggin committee broad power, Howell, in any event, so long as he remained silent, was bound by every step they took and in turn they bound themselves as to him by their acts done in pursuance of this same agreement. If they abandoned reorganization, he must take the consequences. If they accomplished reorganization, he must abide by the result for better or for worse. To assert that they could reorganize as far as affected themselves and utilize judicial procedure as a step to that end, but call the procedure something else as affecting Howell, is to ignore the intent and purpose of the document of April 10, 1912. While only those depositors

who assented to a plan of reorganization were bound, yet McCrum and Howell bound themselves by the addendum wherein they severally assented to the terms of the agreement.

It is unnecessary to determine what the situation would have been as matter of law if, at the hearings in the court in Pennsylvania, Howell had objected to the plan and agreement of reorganization or to the sale. He was under no legal obligation to express his view nor to warn the committee of the effect in law of their acts; and it is not at all certain that they would have changed their course if he asserted to them what he does now.

Every step the Wiggin committee took relates back to April 10, 1912, and every paper they signed reads into the instrument of April 10, 1912. In the plan for reorganization of September 27, 1912, it was provided:

"The annexed agreement of reorganization * * * constitutes a part hereof." Last paragraph.

In the "annexed agreement" of September 27, 1912, the agreement of April 10, 1912, is recited and then:

"It is intended that this agreement shall be and *it is* the agreement of reorganization and readjustment contemplated in the agreement dated April 10, 1912. * * *" Paragraph seventh.

As if to say (colloquially):

"Mr. Howell, we now advise you that we have finally determined on a plan of reorganization as to the details of which we herewith inform you and this is the plan to which you have taken no objection for you gave us plenary power on April 10, 1912. The indorsement creditors retain their rights against you, whatever they may be."

The circular of September 27, 1912, places the committee's construction upon its own procedure and shows beyond dispute that the judicial sale was to be merely a step in the reorganization. More than that, every step thereafter shows that the reorganization plan was carried out to the letter and the committee's knowledge was Howell's knowledge up to the last act and the last document necessary to carry into complete effect the plan of reorganization. If, throughout, it be remembered that the only rights which by waiver and consent the committee retained against Howell originated in the agreement of April 10, 1912, and that as to him every act they did in pursuance of that agreement bound both him and them, then it will be seen that he does not collaterally attack the court's decree.

The stenographic minutes of the hearing before Judge Buffington support and do not undermine the decree, and they are probably admissible on the facts in this case, but we may dispose of the matter without resort to these minutes.[1] It is enough to read the decree in the light of the undisputed facts.

In addition to those set forth, there are others of significance. Why did the decree require confirmatory deeds from the McCrum-

---

[1] Note.—Much is said because the minutes were not "official." There are no official stenographers in the District Courts except in equity under the rules effective on February 1, 1913.

Howell Company? Why was the expression used, "any other plan or method of sale?" Why was the price fixed at $870,000 except to conform with the plan of reorganization? See testimony of Wiggin and Stettinus. Why did the cross-bill attach the agreement of April 10, 1912, and make clear that the bill was filed to facilitate a reorganization? Finally on this branch it is urged that the decree was not a consent decree because opposed by one creditor; but the recital in this regard in the final decree shows that the objection was pro forma and is particular in stating that there was "no objection to a decree directing a private sale of the assets," and that the objecting creditor "desired to be considered as making a formal objection" on the ground of inadequacy of price.

The next question is: What was the value of the property of the company upon which the reorganization rested? Here both sides cite Northern Pacific Ry. v. Boyd, supra, as authority for their contentions. Whatever may be urged was decided in that case, it was clearly held that, as between the parties and the public generally, the sale was valid but as against creditors it was a mere form. Then the court continued:

"The invalidity of the sale flowed from the character of the reorganization agreement regardless of the value of the property, for in cases like this the question must be decided according to a *fixed principle*, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale, the property was insufficient to pay prior incumbrances."

The court (at page 507 of 228 U. S., at page 561 of 33 Sup. Ct., 57 L. Ed. 931) pointed out that the purchaser at foreclosure at once issued securities aggregating $345,000,000 on a property which a month before had been bought for $61,000,000.

"But there was an entirely different estimate of the value of the road when the reorganization contract was made. For that agreement contained the distinct recital that the property to be purchased was agreed to be 'of the full value of $345,000,000, payable in fully paid nonassessable stock and the prior lien and general lien bonds. * * *' The fact that at the sale, where there was no competition, the property was bid in at $61,000,000 does not disprove the truth of that recital, and the shareholders cannot now be heard to claim that this material statement was untrue and that as a fact there was no equity out of which unsecured creditors could have been paid, although there was a value which authorized the issuance of $144,000,000 fully paid stock. If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever."

While the facts in Northern Pacific Ry. v. Boyd differ from those in the case at bar, certain principles, it seems to me, by parity of reasoning, are here applicable. Howell was a possible debtor and not a creditor, but, before his secondary liability can now be fixed, the value of the property of the principal debtor must be ascertained. That value should be ascertained, if possible, "according to a fixed principle." Had the sale been independent of a plan of reorganization, the value for all purposes would appear in the decree; but where the

property is dealt with in a reorganization, such as this, how shall we find the value as against this indorser? The property must be regarded as a going concern, for the purpose of the reorganization was, of course, to keep the business alive.

"The investigations made by the committee have convinced it that, if the property be disposed of at a forced sale, the creditors can realize but a small percentage of their claims. The business, however, appears * * * to have an earning power." Exhibit 1.

The appraisals and estimates of experts would, in this case, be speculative at best (see estimates Gunn, Richards & Co. and Strong; testimony of Wiggin and Stettinus, especially in answer to the court's questions); but the valuation placed on the property by the Wiggin committee was exact and not speculative. To carry out the reorganization, the Wiggin committee proposed to transfer, and did transfer, the property of the principal debtor and $340,000 in cash for $4,725,-000 of stock. The committee knew and were bound to know that under the laws of Delaware the property thus transferred was of the actual value of $4,725,000, else full-paid capital stock to that amount could not have been issued. If the $340,000 cash be deducted from this total, or if by some process of figuring $870,000 be deducted, the balance attributable to the value of the property is far in excess of the debts of the company.

The Wiggin committee creditors cannot be heard as against Howell to attack the value of the Delaware stock. That was their view of the value of the property for reorganization purposes, and the public, thenceforth, were entitled to deal with the stock as full paid and nonassessable and on the assumption that the property for which issued was as stated in the minutes of Richmond Radiator Company November 26, 1912, "of the actual value of $4,725,000."

Enough has been pointed out to warrant the conclusion that, as between the petitioners and the alleged bankrupt, the latter's liability as indorser no longer exists. Other contentions have been suggested which present persuasive considerations in support of the respondent's view, but the limits of an opinion (already long) preclude further discussion.

The petition should be dismissed.