## NEW ENGLAND COAL & COKE CO. v. RUTLAND R. CO.

### No. 302.

Circuit Court of Appeals, Second Circuit.

April 26, 1944.

Rehearing Denied May 20, 1944.

180

J. Norman Lewis, of New York City, and Feldman, Kittelle, Campbell & Ewing, of Washington, D. C. (J. Norman Lewis and James P. Durante, both of New York City, of counsel), for appellant.

H. C. McCollom, of New York City (Davies, Auerbach, Cornell & Hardy and Herbert A. Heerwagen, all of New York City, of counsel), for Hubert F. Atwater and William Carnegie Ewen, appellees.

Rathbone, Perry, Kelley & Drye, of New York City (Parker Newhall and Frank H. Heiss, both of New York City, of counsel), for Central Hanover Bank & Trust Co., appellee.

Stewart & Shearer, of New York City (M'Cready Sykes, of New York City, of counsel), for United States Trust Co. of New York, appellee.

Herrick, Smith, Donald, Farley & Ketchum, of Boston, Mass. (Eugene T. Connolly, of Boston, Mass., of counsel), for Old Colony Trust Co., appellee.

George M. Jaffin, of New York City, and Vernon Loveland, of Rutland, Vt. (Phillip B. Wershile and Harry Schneider, both of New York City, of counsel), for Group of Rutland Bondholders, appellees.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

On May 5, 1938, some five years after the enactment of § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, authorizing the reorganization in bankruptcy of insolvent railroads, an unsecured creditor of Rutland Railroad Company (for convenience called the debtor), disregarding § 77, filed a bill in equity in the court below, naming the debtor as defendant, alleging its insolvency, and praying the appointment of a receiver for it and all its railroad properties. Upon the immediate consent of the debtor, the court promptly appointed such a receiver.[1] Debtor having defaulted in the payment of interest on three issues of its bonds (in the face amount, respectively, of $1,325,000, $3,491,000 and $4,400,000) secured by first mortgages on portions of its property, a few months later the trustees under the mortgages filed foreclosure bills in the court below. In September 1940, those foreclosure proceedings were consolidated with each other and with the receivership proceeding. The receiver originally appointed subsequently resigned, as did his successor. The present receiver, appointed May 19, 1941, was, at the time of his appointment, General Freight Agent of the debtor, having served in that capacity for thirty-eight years.[2] On February 17, 1942, pursuant to petitions filed by the mortgage trustees, the court extended the receivership to the mortgaged properties. The unmortgaged assets include 115 miles of the debtor's railroad.[3]

For three and two-third years after the beginning of the receivership proceedings, the debtor sat under the "chancellor's umbrella," without any effort by anyone to devise and present a reorganization plan. Then, on February 16, 1942, on petition of the receiver, the court appointed Hubert F. Atwater and William C. Ewen to formulate and submit to the court a plan for the debtor's reorganization. Since April 1940, when they had attended a meeting of a group of bondholders called by one of the mortgage trustees, they had been serving as members of an advisory bondholders' committee. Ewen, engaged in the investment security business, had had experience in the reorganization of traction companies and as a voting trustee of an electric utility company. Atwater, as an employee of investment banking houses, had learned something of the financial aspects of railroad reorganizations. These facts are pertinent as bases of comparison of their experiences and competence with that of the Interstate Commerce Commission. The court's order authorized the receiver to pay Atwater and Ewen not to exceed $250 a month and expenses for a period not to exceed 3 months (later extended to 6 months) with the proviso that such payments should not affect their right to receive additional compensation as reorganization managers or otherwise, for their services theretofore or thereafter performed, in case they were instrumental in consummating a successful plan of reorganization.[4]

---

[1] The record does not contain all this data, but on the oral argument in this court, all parties conceded that such were the facts.

[2] Had the proceedings been brought pursuant to § 77, if the present receiver had been appointed trustee, the court would have been required to appoint an additional independent trustee, i. e., one who had had no previous affiliation with the debtor. See § 77(c) (1).

[3] Among the important reasons for the use of a consent receivership as a preliminary to foreclosure, is the following: "As a receiver under a bill to foreclose a mortgage is receiver only of the mortgaged property, it may be that, because it is unmortgaged, property useful, perhaps almost essential, to the best operation of the road will not come into his possession. Such property may be seized at law by creditors pursuing their legal remedies; and it may be claimed that the liens which they obtain by judgment and attachment or execution extend to property which the receiver claims under the mortgage. These troubles are avoided by beginning with a creditor's bill; for the receiver under that bill is, of course, receiver of all the property of the railroad company, mortgaged or unmortgaged, and the administration of the property, its marshalling and distribution are all in the equity court." Byrne, Foreclosure of Railroad Mortgages in Some Legal Phases of Corporate Financing, Reorganization and Regulation (1917) 77, 79. See also 1 Gerdes, Corporate Reorganizations (1936) 36; Securities and Exchange Commission, Report On the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VIII (1940) 27-30.

[4] If a § 77 proceeding were to supersede the equity proceeding, this arrangement for further compensation might

After some six months of study, Atwater and Ewen filed with the Court, on August 10, 1942, a report accompanied by a proposed plan of reorganization which made no provision for participation by debtor's present stockholders. Pursuant to notice, the court held hearings on this plan on September 12 to 15, 1942. At the opening of these hearings, the receiver's counsel stated that the receiver was neutral, neither favoring nor opposing the proposed plan. Of the 195 pages of the printed transcript of the hearings, some 33 pages consist of the testimony of the receiver and of three of the operating officials of the railroad, while 162 pages consist of the testimony of Ewen and Atwater and remarks of counsel.

These hearings were adjourned on September 15, and were not resumed until March 12, 1943. Meanwhile, on December 11, 1942, some three months after the adjournment of the September hearings, the debtor filed in the receivership proceeding a petition pursuant to § 77, sub. i, of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. i, praying that the corporation be reorganized under § 77. Subsection (i) of § 77 reads, in part, as follows: "If a receiver or trustee of all or any part of the property of a debtor has been appointed by a Federal or State court, whether before or after August 27, 1935, a petition or answer may be filed under this section *at any time thereafter* by such debtor, or its creditors as provided in subsection (a) of this section, and if such petition be approved, the trustee or trustees appointed under this section, or the debtor until such trustee or trustees are appointed, shall be * * * vested with title to such property * * *." [5]

The prime mover in this matter of the § 77 petition was originally John D. Babbage who, for himself and others, had purchased blocks of the debtor's bonds and preferred stock. During the receivership he had become debtor's president. While he was president, the stockholders and executive committee of the board of directors adopted resolutions, on December 1 and 5,

1942, respectively, authorizing the filing of the § 77 petition.

On January 8, 1943, the court held a hearing on this petition. A further hearing was held on March 12, 1943, that hearing being consolidated with a further hearing of the proposed plan of reorganization. At that joint hearing, the attorney who on January 8 had represented the debtor in presenting the petition told the court that he had resigned as debtor's counsel on February 27, and that, since January 8, it had been arranged that he, as representative of "Mr. Babbage's group" (which had a far larger interest in debtor's bonds than in its stock), was to become one of the three reorganization managers under the proposed plan, the other two being Ewen and Atwater. As a consequence, so this attorney advised the court, "We thought his [Babbage's] interests and those of other bondholders would be protected and therefore we felt we could go on with the plan as proposed, except for one amendment" (i. e., that stockholders be given an opportunity to purchase stock of the new company from any bondholders who desired to sell).[5a] The court asked this attorney, "What is the position of your clients now on the petition to go into 77?" He replied, "I suppose it could be stated we do not wish to press it." [5b]

The debtor was thus left without counsel, but did not withdraw and never has withdrawn its petition. When its lawyerless condition was disclosed, appellant, as owner of 2900 shares of debtor's preferred stock and also as representative of others owning 4300 such shares,[6] asked leave in open court on March 12 to intervene both in the equity proceeding and in the matter of the 77 petition; subsequently appellant filed a formal petition for intervention in both matters in the capacity just described, and an order allowing such interventions was entered by the court on March 19, 1943. The court adjourned the joint hearings of March 12 until March 27, 1943.

The testimony at the hearings in September and on March 27 disclosed, among other things, the earnings of the debtor over a period of years; the fact that the

---

lose much of its value to Messrs. Ewen and Atwater.

[5] Emphasis added.

[5a] He also said that before he resigned he had become convinced, from informal conversations with members of its staff, that the Interstate Commerce Commission would not approve a plan allocating

any securities to stockholders. As to those conversations, see footnote 20.

[5b] Cf. American United Mutual Life Insurance Co. v. City of Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860.

[6] There are outstanding 89,625 such shares.

earnings had recently increased substantially; that perhaps that increase had little reference to war conditions; that depreciation charges and wages were apparently about to be augmented substantially; that the proposed plan provided for the issuance of about $2,500,000 face amount of new 4% income bonds and $8,500,000 face amount of new common stock; that the aggregate face amount of the proposed new securities would be less than the amount of the now existing debts; that all the new securities were to go to holders of present debt claims and nothing whatever to the present stockholders; that some holders of bonds were dissatisfied with the proposed plan; and that Ewen and Atwater had based their plan on a capitalization at 5% of their estimate of anticipated net revenues available for interest and dividends. All parties agreed that stockholders were entitled to participation only if the value of debtor's property exceeded the amount of its debts, and that the proper basis of valuation for that purpose was the capitalization, at a reasonable interest rate, of reasonably anticipated net revenues. Appellant insisted that, on that basis, the evidence showed excess value justifying stockholders' participation, while appellees asserted the contrary.

The district court, on April 12, 1943, entered an order denying the petition for reorganization under § 77. The court rendered no opinion and made no findings of fact or conclusions of law. From the order of April 12, 1943, appellant has brought this appeal.[7]

1. In 1928, in Harkin v. Brundage, 276 U.S. 36, 52, 48 S.Ct. 268, 274, 72 L.Ed. 457, the court said: "We do not wish what we have said to be taken as a general approval of the appointment of a receiver under the prayer of a bill brought by a simple contract creditor simply because it is consented to at the time by a defendant corporation. The true rule in equity is that under usual circumstances a creditor's bill may not be brought except by a judgment creditor after a return of 'nulla bona' on execution. When a *receiver* has been *thus irregularly appointed on such a bill* without objection, and the administration has proceeded to such a point that it would be detrimental to all concerned to discharge the receiver, the receivership has been permitted to continue because not seasonably objected to."[8] In 1932, before the enactment of § 77, in People of State of Michigan v. Michigan Trust Co., 286 U.S. 334, 345, 52 S.Ct. 512, 515, 76 L.Ed. 1136, the court again referred to "the abuses that can arise from friendly receiverships forestalling the normal *processes of administration in bankruptcy * * *.*" Later in that year, in Shapiro v. Wilgus, 287 U.S. 348, 355, 356, 53 S.Ct. 142, 144, 77 L.Ed. 355, 85 A.L.R. 128, the court, again referring to the appointment of receivers in such cases with the consent of the defendant, said: "This is done not infrequently *where the defendant is a public service corporation and the unbroken performance of its services is in furtherance of the public good. * * ** We have given warning more than once, however, that the remedy in such circumstances is not to be granted loosely, but is to be watched with jealous eyes. [People of State of] Michigan v. Michigan Trust Co., 286 U.S. 334, 345, 52 S.Ct. 512, 76 L.Ed. 1136; Harkin v. Brundage, supra. *Never is such a remedy available when it is a* mere weapon of coercion, a *means for the frustration of the public policy* of the state or the locality."[9] See also National Surety Co. v. Coriell, 1933, 289 U.S. 426, 436, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231.

In 1934, after the enactment of § 77, the court, in First National Bank v. Flershem, 290 U.S. 504, 515, 516, 525, 526, 54 S.Ct. 298, 303, 78 L.Ed. 465, 90 A.L.R. 391, again referring to such consent receiverships, said: "All the cases in which this Court appears to have exercised this power in aid of reorganization upon the ground of insolvency dealt with railroads or other public utilities where continued operation of the property and preservation of its unity seemed to be required in the public interest." It then significantly added: "The Act of March 3, 1933 [§ 77] amending the Bankruptcy Act, * * * provides: 'Reorganization of railroads engaged in interstate commerce. (a) Any railroad corporation may file a petition

---

[7] The debtor has not appealed but has raised no objection to appellant's appeal.

[8] Emphasis added. For the background of that decision, see Pusey & Jones v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; Hollins v. Brierfield Coal & Iron Co., 150 U.S. 371, 14 S.Ct. 127, 37 L.Ed. 1113; Re Metropolitan Ry. Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L. Ed. 403. Cf. Kelleam v. Maryland Casualty Co., 312 U.S. 377, 381, 61 S.Ct. 595, 85 L.Ed. 899.

[9] Emphasis added.

stating that the railroad corporation is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization.'" The court also said: "The failure to secure an adequate price seems to have been due, not to lack of opposing evidence, but to the mistaken belief that it was the duty of the court to aid in effectuating the plan of reorganization, since a very large majority of the debenture holders had assented to it. Moreover, the court stood in a position different from that which it occupies in ordinary litigation, where issues are to be determined solely upon such evidence as the contending parties choose to introduce. In receivership proceedings, as was held in National Surety Co. v. Coriell, 289 U.S. 426, 436, 53 S.Ct. 678, 77 L.Ed. 1300 [88 A.L.R. 1231], every important determination by the court calls for an informed, independent judgment; and special reasons exist for requiring adequate, trustworthy information where the jurisdiction rests wholly upon the consent of the defendant who joins in the prayers for relief. It would be unreasonable to impose upon a few dissenting creditors the heavy financial burden of making an adequate appraisal supported by the testimony of competent experts, where, as here, the assets include extensive plants and equipment located in nine states." [10]

In 1943, in Ecker v. Western Pacific R. Co., 318 U.S. 448, 468, 469, 63 S.Ct. 692, 705, 87 L.Ed. 892, the court, referring to railroad reorganizations under § 77, said: "Since railroads could not take advantage of the Bankruptcy Act, § 4, * * * 11 U.S.C.A. § 22, their financial adjustments for years had been carried out in equity receiverships under judicial control. These were cumbersome, costly and privately managed with inadequate consideration for the public interest in a soundly financed transportation system. * * * These reorganizations require something more than contests between adversary interests to produce plans which are fair and in the public interest. When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest. Congress outlined the course reorganization is to follow. It established standards for administration and placed in the hands of the Commission the primary responsibility for the development of a suitable plan. When examined to learn the purpose of its enactment, Section 77 manifests the intention of Congress to place reorganization under the leadership of the Commission, subject to a degree of participation by the court. It is clear from the discussions and the statute itself that there was recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public creditors and stockholders." [11]

■ 2. From those cases we deduce the following: Before the enactment of § 77 in 1933, a consent receivership of a railroad was condoned because the Bankruptcy Act was not applicable to such a corporation and such a receivership was therefore often necessary in the public interest to make possible the continued operation of the railroad and its preservation as a unity. Since the enactment of § 77, however, that reason for condoning such a receivership has vanished and it is now "a means for the frustration of the public policy" of the United States embodied in § 77.

■ That statute was designed to prevent the notorious evils and abuses of consent receiverships which included, among other things, the polar evils of reorganizations in which stockholders were sometimes permitted to participate at the expense of creditors when there was no excess of value over the debts [12] and in which stockholders, or some of them, were sometimes unfairly squeezed out when such ex-

---

[10] See, also Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 520, 61 S.Ct. 675, 85 L.Ed. 982.

[11] As above noted, the plan proposed here was formulated by Atwater and Ewen, who, before their appointment for that purpose, had represented bondhold-

ers solely. In the court below and on this appeal they have been the principal opponents of the § 77 petition.

[12] See, e. g., Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Chicago, R. I. & P. R. R. v. Howard, 7 Wall. 392, 19 L.Ed. 117.

cess value existed.[13] Representative Rayburn, Chairman of the House Committee in charge of the bill which became § 77, said: "I believe therefore that in order to protect stockholders, in order to protect bondholders, in order to protect everyone who is a creditor of a railroad, and the public as well, we should pass this or some other legislation at the earliest hour, to put an end to these long drawn out, these expensive and in many instances these disgraceful receiverships that have happened in the past." [13a]

While we do not have in this record the bill in equity filed by complainant pursuant to which the receiver was appointed, we are of course aware of the contents of a conventional bill of that type.[14] It alleges that the only remedy available, to prevent dismemberment of the railroad, through the levying of executions by divers creditors—with consequent disruption of its service to the public and injury to complainant and others financially interested—is the appointment by the court of an equity receiver for the railroad and its properties. When this bill was filed in 1938, any such allegations must have been unfounded, since the public, and those interested financially in the railroad, could be amply protected through the filing of a petition pursuant to § 77.

 In place of the shoddy, leaky, chancellor's umbrella supplied at the instance of an unsecured creditor and upon the debtor's consent, Congress had supplied the well-built shelter of the Bankruptcy Act. Consequently the receiver here was "irregularly appointed." We do not mean, nor do we even intimate, that the district judge was aware of that irregularity or that the parties to the institution of the receivership wilfully intended to impose upon the court. We do mean that, once the judge's attention was directed, in any way, to that irregularity, he should have taken steps to correct it. The filing of the § 77 petition illuminated the basic flaw in the equity proceeding (resulting from its illegitimate inception) and offered an obvious simple means of eradicating it. As § 77, sub. i, expressly provides for an easy transition from an equity receivership to proceedings under § 77, it cannot be said that the administration of the receivership estate here had "proceeded to such a point that it would be detrimental to all concerned to discharge the receiver." [15]

 3. As an argument for affirmance of the order denying the petition, appellees suggest that, under § 20a of the Transporation Act, 49 U.S.C.A. § 20a, the Commission will review an equity receivership plan, using substantially the same criteria as it would under § 77. That suggestion is untenable, since 20a is directed primarily to safeguarding the "public interest" of avoiding the issuance of so large an amount of new securities and such heavy fixed charges that the railroad cannot properly serve the public.[16] As the Supreme Court noted in Ecker v. Western Pacific R. Corp.,

---

[13] Cf. Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 324, 59 S.Ct. 543, 83 L.Ed. 669; First Nat. Bank v. Flershem, 290 U.S. 504, 517, 518, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391.

[13a] He also said of the legislation: "No financial setup, no reorganization to squeeze out stockholders or to do an injustice to the public can come about until the Interstate Commerce Commission, the arm of Congress, the representative of the public in this country, has placed its stamp of approval upon any plan of reorganization." 76 Cong. Rec. 2917.

[14] Usually the debtor and the mortgage trustees arrange with the creditor for the filing of the bill. It is agreed in advance that the debtor will at once file an answer admitting the allegations and joining in the prayer of the bill. The court is asked to appoint the receiver forthwith on the filing of the bill and

answer. The receiver is usually an officer of the company. After the receiver is appointed, the complainant creditor ceases to play any active part in the proceedings.

In the instant case, the complainant did not appear at any of the hearings in the record before us and has not appeared on this appeal.

[15] In Harkin v. Brundage, the court conditioned its decision directing the dismissal of the receivership by providing that the receiver in the suit previously brought should produce an order from the court which appointed him confirming all that had been theretofore done in the federal equity receivership proceedings. Subsection i of § 77 gives the district judge full authority to accomplish a similar result.

[16] See United States v. Chicago, Milwaukee, St. Paul & Pac. R. Co., 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359; Ecker v. Western Pac. R. Corp., 318 U.S. 448, 474, 481, 512, 63 S.Ct. 692, 87 L.Ed.

318 U.S. 448, 464, 481, 63 S.Ct. 692, 711, 87 L.Ed. 892, not only does § 77 provide a standard (i. e., "compatible with the public interest") which is virtually that contained in the provisions of the Transportation Act, § 20a, but those provisions "were carried into and made a part of the reorganization section [77] by subsections c (3) and f." In addition, subsection d calls on the Commission to see to compliance with the demands of subsection (e), i. e., that the plan "is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders." Thus the Commission under § 77 has two functions: (a) The first, which is virtually the same as that under Transportation Act § 20a, to see that (to use the more crisp language of Chapter X, 11 U.S.C.A. § 501 et seq.) the plan is "feasible";[17] (b) the second, to see that it is "fair and equitable."[18] (A plan may be feasible and yet be not fair and equitable;[19] thus if a reorganization plan for a railroad, with assets worth $15,000,000 and debts of $11,500,000, were to provide for the issuance of nothing but common stock having an aggregate par value of $10,000,000, all to be distributed to the old creditors, the plan would clearly be feasible and fully protective of the public interest in the railroad's services, but it would be wanting in fairness.) Since § 77 thus incorporates the standards of the Transportation Act and also the "fair and equitable" standard, it follows that the court had no discretion to deny a petition filed under § 77, sub. i, on the ground that the exercise of the Commission's powers under the Transportation Act, with reference to an equity reorganization plan, will serve substantially as well.[20] In other words, Congress has decided that an equity receivership supplemented by Transportation Act, § 20a is not a sufficient substitute for § 77.[21]

4. The only grounds for denying such a petition are that it has not been filed by a proper person or that it has not

---

892; cf. New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 77 L.Ed. 138.

[17] "Feasibility" in § 77 is also covered in subsection (b) (4). As to feasibility under Chapter X, see Report of the Securities and Exchange Commission, cited in footnote 3, 159-161.

In the case of a railroad, feasibility means not merely the safeguarding of future investors in the new securities but also protection of adequate service to the public.

[18] As to the history and meaning of that phrase, see Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115-119, 60 S.Ct. 1, 84 L.Ed. 110.

[19] Or fair and equitable but not feasible.

[20] Appellees, in the hearings before the district court, referred to informal conversations between Atwater and others with members of the Commission's staff. So far as can be ascertained from the record, these conversations related not at all to the fairness of the plan but solely to the maximum amount of bonds and stocks which the Commission might approve. The record contains a letter, dated March 10, 1943, addressed to appellant, from the Director of the Commission's Bureau of Finance, saying, "The Commission's duties with respect to the receivership plan is derived from the provisions of § 20a of the Interstate Commerce Act, and is limited to the authorization of securities provided for in the plan. The court may proceed at once to approve such a plan, subject to the requisite Commission approval. A separate hearing may or may not be held by the Commission in connection with the performance of its functions in the receivership proceedings, such hearings being wholly discretionary. The Commission does not participate in any way in the proceedings before the court on the receivership plan."

A representative of a holder of some of the bonds remarked to Atwater at one of the hearings in the district court that "apparently your conferences with the I. C. C. were conducted upon the ethereal region of sympathetic mental telepathy, as near as I can deduce it * * * Apparently you went down in proximity to the Commission and absorbed some psychic impulse * * *"

[21] Fuller (who acted as Consultant to Eastman, the Federal Co-ordinator of Transportation, in drafting amendments to § 77 which Congress enacted in 1935) said of equity receivership reorganizations: "Nor did the authority of the I. C. C. over the issuance of securities result in material improvement of the financial structures of the reorganized companies. The Commission's control was brought to bear so late in the proceedings that it usually gave its approval to

been filed in "good faith."[22] That the prior participation of the debtor in a pending proceeding does not constitute lack of "good faith" appears clearly from Marine Harbors Properties Inc. v. Manufacturers Trust Company, 317 U.S. 78, 84, 85, 63 S. Ct. 93, 87 L.Ed. 64, where the court rejected the position taken in Brooklyn Trust Co. v. Rembaugh, 2 Cir., 110 F.2d 838, that the debtor's petition under Chapter X of the Bankruptcy Act was not filed in "good faith" since the debtor was seeking to escape the jurisdiction of a state court in a prior proceeding to which the debtor had voluntarily submitted itself and in which it had assented to a plan.[23] Moreover, there the court was dealing with Chapter X which contains a provision, § 146(4), 11 U.S.C.A. § 546(4) not found in § 77, that "a petition shall be deemed not to be filed in good faith if * * * (4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding." True, § 77, sub. i, recognizes that there may be a prior equity receivership proceeding;[24] but it in no way indicates that the existence thereof shall have any bearing on good faith. Even if, in some circumstances, a contrary argument might perhaps conceivably be tenable, it cannot be so in this case where the prior proceeding was "irregularly" instituted and is therefore of a kind which, so the Supreme Court has said, cannot adequately safeguard the interests of the public, creditors and stockholders. In other words, there is nothing express or implied in § 77 that the pendency of "consent receivership" is any evidence of lack of good faith in the filing of a petition under § 77, sub. i.

In the Marine Harbors Properties case, the court, in holding that the petition should be denied, stressed the fact (317 U. S. at page 85, 63 S.Ct. at page 97, 87 L. Ed. 64) that the debtor had admitted that its property was worth less than the amount of the first mortgage debt so that there was no basis for allowing stockholders to participate in the reorganization. In the instant case, appellant strenuously asserts the existence of excess value over the amount of the debts. Also, in Marine Harbors Properties, the court said that, as the debt consisted wholly of a single mortgage against which participation certificates, all of one class, were outstanding, the reorganization was unusually simple and needed none of the safeguards afforded by the reorganization provisions of the Bankruptcy Act.[25]

---

unsound capital structures to avoid the costs of prolonged receivership. Reorganization plans, too, were frequently unfair. The judges were too busy carefully to examine the plans proposed * * *" Fuller, Background and Techniques of Railroad Reorganizations, 7 Law and Contemporary Problems (1940) 377, 384.

[22] These requirements are explicitly set forth in § 77, sub. a. They are, we think, incorporated by reference in § 77, sub. i, for it refers to a petition filed "as provided in subsection (a) of this section" and calls for its approval by the court.

[23] There was no intimation that the prior (state court) proceeding had been "irregularly" instituted.

[24] There can, of course, be a receivership proceeding "regularly" instituted, as in a state court by an unsecured creditor where state law permits or in a state or federal court by a judgment creditor after a return of nulla bona or by a lien creditor foreclosing his lien.

[25] The court said (317 U.S. at page 87, 63 S.Ct. at page 98, 87 L.Ed. 64): "There remains the contention that it was in the 'interests' of the certificate holders to have the proceedings transferred to Ch. X. In this connection much emphasis is placed on numerous safeguards contained in Ch. X which this Court reviewed in Security & Ex. Commission v. United States Realty & Imp. Co., 310 U.S. 434, 448–450, 60 S.Ct. 1044, 1049, 1050, 84 L.Ed. 1293. And it is asserted that comparable safeguards are wholly or largely lacking in proceedings under the Schackno Act. Those considerations would be highly relevant and persuasive if this were a case of the usual reorganization proceeding dealing with more than one class of securities under the older procedures which Ch. X was designed to improve and supplant. See Sec. & Exchange Comm'n v. U. S. Realty & Imp. Co., supra, 310 U.S. at page 448, 60 S.Ct. at page 1049, 84 L.Ed. 1293; H. Rep. No. 1409, 75th Cong., 1st Sess., pp. 37 et seq. Then the safeguards afforded by Ch. X would have special significance in protecting the respective classes of investors against improvident, unfair or inequitable adjustments, compromises, and settlements; steps which are basic to the reorganization process but which in selfish hands led to much abuse."

5. As a further argument for affirmance of the order denying the petition, appellees urge that § 77 "has not fulfilled its purpose," that the advantages claimed for it have "not in many respects materialized." They assert that § 77 proceedings invariably cause greater delay in reorganizing than do equity receiverships. No controlled experiment has been conducted which would support that dogmatic assertion, for obviously there can have been no case where the same railroad under the same conditions has been reorganized by one and then by the other method. But assuming that in some instances the equity method has been speedier, we would conjecture that the greater speed has been due to the fact that that method permitted the use of one or more of the devices which Congress intended, by § 77, to preclude—including, for example, the procuring of assents to the plan from the great majority of the interested security holders before its presentation to the Commission, with a resultant pressure on that body against which it has protested;[25a] the demonstrably unsatisfactory technique of the upset price;[26] the immunization of payments and transfers which would be voidable preferences in bankruptcy; the avoidance of investigation and prosecution, by a disinterested trustee, of causes of action against officers and directors for irregularities, fraud, misconduct or mismanagement;[27] and the ability of special groups to make unscrutinized arrangements appeasing diligent opponents of a plan who might otherwise bring to light some of the plan's defects.[28] Moreover, since the Supreme Court in recent cases has clarified the bases of fair and equitable reorganization plans,[29] the delays under § 77 have not been great.[30] Delays, unavoidable whether reorganization be conducted under § 77 or in equity, have often resulted, too, from the inherent complexities of large railroad systems, complexities of a type which seem to be absent here. Of paramount importance on this issue of speed is the fact that the legislative history of § 77 shows that, as the Supreme Court has said, Congress concluded that equity receiverships not only caused greater delay but did not adequately protect the public, the creditors and, in some instances, stockholders. In Continental Illinois National Bank v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 685, 55 S.Ct. 595, 79 L.Ed.

---

[25a] See In re Chicago, Milwaukee & St. Paul Investigation, 131 I.C.C. 615, 671, 672; Fuller, The Background and Techniques of Railroad Reorganizations, 7 Law and Contemporary Problems (1940), 377, 384.

[26] See Report of the S. E. C., cited in footnote 3, 38–47; Weiner, Conflicting Functions of the Upset Price in a Corporate Reorganization, 27 Col.L.Rev. (1927) 132; 19 Va.L.Rev. 541, 554; Mechanics & Metals' Nat. Bk. v. Howell, D.C., 207 F. 973, 981.

[27] As to investigation of such causes of action, see § 77, sub. c (9); see also the Report of the S. E. C., cited in footnote 3, supra, 109–110; 18 N.Y.L.Q.R. (1941) 399, 436–442. As to the requirement that at least one trustee be disinterested, see § 77, sub. c (1).

[28] Referring to the arrangement made with debtor's president for abandonment of opposition to the plan (an arrangement by which debtor's former counsel was to be one of the reorganization managers) the mortgage trustees say in their brief in this court that "it is one of the great advantages of the equity over the § 77 procedure that it lends itself to the compromising of divergent views, rather than to their litigation, and that is what happened here." But Congress enacted § 77 in part to prevent such methods of "compromising of divergent views." Cf. Marine Harbor Properties case, 317 U. S. at page 87, 63 S.Ct. 93, 87 L.Ed. 64; American United Mutual Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860.

[29] Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L. Ed. 110; Marine Harbor Properties, Inc., v. Manufacturers Trust Co., 317 U.S. 78, 63 S.Ct. 93, 87 L.Ed. 64; Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Group of Investors v. Chicago, M., St. P. & P. R. Co., 318 U. S. 523, 63 S.Ct. 727, 87 L.Ed. 959.

[30] It may well be that, without harm to the standards of § 77 greater speed could be obtained if, by amendments to the Act, the Interstate Commerce Commission, vis a vis the fairness of railroad reorganization plans as distinguished from their feasibility, were assigned a role similar to that played by the Securities and Exchange Commission in corporate reorganizations under Chapter X, i. e., as adviser to the court and the interested parties. See Monograph of the Attorney General's Committee on Administrative Procedure, Part 13, Securities and Exchange Commission (77th Cong.. 1st Sess., Document No. 10. Part 13) 132–133.

1110, the court said: "The delay and expense incident to receiverships and foreclosures constituted, probably, the chief reasons which induced the passage of § 77 * * *" In Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 545, 63 S.Ct. 727, 740, 87 L.Ed. 959, the court said: "Elimination of delay in railroad receiverships and foreclosure proceedings was one of the purposes of the enactment of § 77."

Even if we disagreed with those comments, we would have no right to adopt appellees' suggestion and to proceed on our own notions of legislative policy. As several Supreme Court Justices and eminent commentators have said, some judicial legislation is one of the unavoidable facts of life.[31] But judicial law-making should always be cautiously employed and should be severely restricted in scope.[32] The day is happily gone when courts regarded Congressional enactments as questionable intrusions on judicial prerogatives.[33] We cannot, as appellees would have us do, use judicial legislation to eviscerate constitutional legislative legislation.[34]

Moreover, the delay argument is peculiarly inapposite here. As noted above, for two years and eight months after the appointment of a receiver no efforts were made to devise a plan.[35] Then, after six months of study, a plan was proposed. Three days of hearings on that plan were held about a month thereafter; in those hearings, most of the testimony was that of Ewen and Atwater, the plan's proponents. Those hearings were adjourned and, in the interval, four months after the plan was filed and three months after those incomplete hearings were thus adjourned, the petition was filed. Surely we do not here have any considerable delay constituting laches. Indeed, the chief delay has been caused by the failure to grant the petition in December 1942 and the resultant appeal from the order of April 12, 1943. In all probability, had the petition been granted promptly, the Interstate Commerce Commission would have concluded its work in connection with a plan, and a plan under § 77 would by now have been approved by the district court.[36]

6. Finally, appellees urge that appellant has no standing to maintain this appeal. The argument runs thus: Under § 77, sub. a, and therefore under sub. i, a petition may be filed only by the railroad

---

[31] See Holmes, J., in Southern Pacific Co. v. Jensen, 244 U.S. 205, 218, 221, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900, and in Common Carriers and The Common Law, 13 Am.L.Rev. (1879) 630; Cardozo, J., in The Nature of the Judicial Process (1921) 10, 103, 113, 146–149; Hughes, J., Addresses and Papers (2d ed. 1916) 185–186, and The Supreme Court of the United States (1928) 230; Brandeis, J., Business—a Profession (1933) 243; Stone, J., The Common Law in the United States, 50 Harv.L.Rev. (1936) 4, 12; Douglas, J. Democracy and Finance (1940) Chap. XXIV; Jackson, J., in State Tax Commission v. Aldrich, 316 U.S. 174, 202, 62 S.Ct. 1008, 86 L.Ed. 1358, 139 A.L.R. 1436, note 23; Frankfurter, J., in United States v. Mitchell, 64 S.Ct. 896.

[32] Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, 246.

[33] S. E. C. v. Joiner Corp., 320 U.S. 344, 350, 64 S.Ct. 120..

[34] Commissioner v. Beck's Estate, supra.

[35] § 77, sub. g, makes provision for a dismissal of a § 77 proceeding if "there is undue delay in a reasonably expeditious reorganization of the debtor."

[36] Indeed, the plan here itself recognizes that, because of lack of assents from a sufficient number of bondholders, it may become necessary to resort to § 77 even if the court approves the plan: The plan provides that, if it is consummated in the equity receivership, nonassenting bondholders will receive no new securities but only "their pro rata distributive share of any balance of the proceeds derived from the sale or sales of the properties of the Railroad * * *" Should a considerable number of bondholders refuse their assent, the amount of cash needed to pay them their pro rata shares would be beyond the cash available. For that reason, the plan provides that, if the Reorganization managers so decide, § 77 proceedings may be utilized. Thus, some time after approval of the equity receivership plan, such proceedings in bankruptcy may be instituted, with a consequent delay greater than that which will result from a present order approving the debtor's petition.

As to this defect in equity reorganizations, see 1 Gerdes, Corporate Reorganizations (1936) § 17, and authorities there cited.

In this connection, it should be noted that, since there have as yet been no solicitations for assents, it is not now known how many bondholders will fail to

company or by its creditors "[having] claims aggregating not less than 5 per centum of all [the] indebtedness of such corporation * * *" Under § 77, sub. c(13), the judge "after approving the petition," may permit any stockholder or duly authorized committee of stockholders to intervene. As appellant is not a creditor, it may not file the petition. As the petition was not approved, the order allowing appellant to intervene was improper, say appellees.

Disregarding all other possible replies to this contention, the short answer is this: The judge had ample discretion to permit appellant to intervene in the equity proceedings, and he did so. Appellant's participation in the hearing on the plan—assuming, arguendo, that his intervention in the equity proceeding did not give him a standing with reference to the § 77, sub. i, petition which was filed therein—may be regarded as, in effect, a motion that the equity proceeding be dismissed. Since that proceeding was "irregularly" begun, he had standing to appeal from the order which improperly denied that relief.

7. We therefore reverse and remand with directions that the district court grant the petition. It is conceivable, although unlikely, that, when the case is remanded, the debtor may seek to withdraw its petition. Whether it may do so, except upon terms and conditions which the court may prescribe, is highly doubtful, to say the least, in the light of Federal Rules of Civil Procedure, rule 41(a) (2), 28 U. S.C.A. following section 723c.[37] In any event, should the petition be withdrawn, the court should dismiss the equity proceedings but should postpone that dismissal for a period of time sufficient to allow the filing of another petition, pursuant to § 77, by any person entitled thereunder to do so.

8. This disposition of the case renders it unnecessary for us to consider the evidence as to prospective earnings or to endeavor to determine whether they are such that there is any reasonable likelihood that the Interstate Commerce Commission, under § 77, could reasonably find that the debtor's assets have a value in excess of its debts so as to permit participation by the stockholders in the reorganization.

Reversed and remanded.

### On Petition for Rehearing.

In their petition for rehearing, appellees cite Guaranty Trust Company v. Seaboard Airline Railway Co., D.C., 53 F.Supp. 672, subsections n and p of § 77, Bankr.Act, 11 U.S.C.A. § 205, subs. n, p, and §§ 142 and 506 of the Revenue Act of 1942, 26 U.S.C. A. Int.Rev.Acts, all as showing that, despite § 77, an equity receivership is still a permissible method of railroad reorganization. But in the Seaboard case the equity receivership had been begun before the enactment of § 77, so that it had not been irregularly instituted, and all parties before the court (including a large majority of the underlying bondholders) opposed the transfer to § 77 which the court alone had suggested. As we said in our original opinion (see note 24), equity receiverships, other than consent receiverships, could properly be begun even after the date of the enactment of § 77; this gives full scope to the cited statutory provisions. We are not to be understood as holding that a receivership irregularly begun must be dismissed if it is clear beyond all doubt—as it is not in the instant case—that no creditors or stockholders can be adversely affected by a failure to have the reorganization conducted under § 77. Nor do we mean that such a receivership must necessarily be dismissed if its irregularity is not called to the court's attention (by the filing of a § 77 petition or otherwise) until after the plan has been approved by the court and accepted by an overwhelming majority of those legitimately interested; that is not the situation here.

The petition for rehearing is denied.

---

assent. The record shows that holders of a not inconsiderable number of bonds are dissatisfied with the plan. The mortgage trustees, appellees, have no power to assent for bondholders, and the only bondholders who have appeared before us as appellees hold but 12% of the bonds.

As to the avoidance of the difficulties of providing cash for dissenters through the so-called "cram-down" provisions of § 77 (as amended in 1935) see Fuller, Background and Techniques of Railroad Reorganization, 7 Law and Contemporary Problems (1940) 377, 389, 390.

[37] It may be, although we do not now so decide, that the court, exercising its equity powers, can direct the debtor not to withdraw the petition already filed.