**ATLANTIC COAST LINE RAILROAD COMPANY, Appellant,**

**v.**

**ST. JOE PAPER COMPANY, et al., Appellees.**

**No. 15244.**

United States Court of Appeals Fifth Circuit.

Nov. 5, 1954.

Rehearing Denied Dec. 9, 1954.

5.

Edward W. Bourne, New York City, Charles Cook Howell, Wilmington, N. C., Charles Cook Howell, Jr., Jacksonville, Fla., Richard B. Gwathmey, Wilmington, N. C., Howell & Howell, Jacksonville, Fla., Alexander & Green, New York City, (Andrew Oliver, New York City, J. Kenneth Campbell, Mineola, N. Y., William A. Boylan, New York City, of counsel), for Atlantic Coast Line R. Co.

William D. Mitchell, New York City, Guy W. Botts, Russell L. Frink, Jacksonville, Fla., Henry L. Walker, Washington, D. C., Giles J. Patterson, Jacksonville, Fla., Howard P. MacFarlane, Tampa, Fla., Harold J. Gallagher, New York City, Edward J. Hickey, Jr., Washington, D. C., H. P. Osborne, Jacksonville, Fla., R. M. McCulloch, New York City, J. Turner Butler, Chester Bedell, Jacksonville, Fla., Sidney S. Alderman, John R. Turney, Washington, D. C., Miller Walton, Miami, Fla., James B. McDonough, Jr., Norfolk, Va., Walter H. Brown, Jr., New York City, Henry P. Adair, Cyril C. Copp, Jacksonville, Fla., John B. Marsh, Edward E. Watts, Jr., Dinsmore Adams, New York City, Fred H. Kent, Jacksonville, Fla., Donald Russell, Columbia, S. C., Clarence M. Mulholland, Toledo, Ohio, Clifton S. Thomson, New York City, John T. G. Crawford, Jacksonville, Fla., Willard P. Scott, Joseph W. Keena, New York City, Miller Walton, of Walton, Hubbard, Schroeder, Lantaff & Atkins, Miami, Fla., George W. Ericksen, of Macfarlane, Ferguson, Allison and Kelly, Tampa, Fla., for appellees.

Before HOLMES, BORAH, and RUSSELL, Circuit Judges.

PER CURIAM.

██ The motion to dismiss should be overruled because this appeal involves entirely new issues, which were not decided or considered by the Supreme Court, and not disposed of by its reasoning or judgment, when this case was before it. 345 U.S. 948, 73 S.Ct. 866; 347 U.S. 298, 74 S.Ct. 574. The Supreme Court reversed the judgment of the Court of Appeals, and remanded the case to the District Court for further proceedings in accordance with its opinion; but it did not give any particular directions to the District Court and did not reinstate the latter's judgment which had been reversed by the judgment of the Court of Appeals. 5 Cir., 201 F.2d 325, 330. To reverse a judgment, according to Webster's dictionary, means to overthrow it by a contrary decision, to make it void, to undo or annul it for error. The mandate of the Supreme Court directed that the judgment of this

court be reversed, with costs, and that this cause be remanded to the District Court for further proceedings in accordance with the opinion of the Supreme Court; but it further appears that the Supreme Court, by its writ of certiorari, had limited its own inquiry, and consequently its own jurisdiction, to the single question as to whether, under Section 77 of the Bankruptcy Act, the Interstate Commerce Commission had "a power to force mergers." 345 U.S. 948, 73 S.Ct. 866. By so limiting its writ of certiorari, the Supreme Court expressly declined to review (1) this court's reversal of the District Court's finding that said plan was neither fair nor equitable and did not afford due recognition of the rights of the 5% bondholders, particularly the minority group; (2) this court's reversal of the District Court's finding that there had been an unnecessary delay in a reasonably expeditious reorganization of the debtor; and (3) this court's reversal of the District Court's decision to dismiss the bankruptcy proceeding and turn the debtor's property over to an equity receiver.

This is the third appearance before us of this proceeding under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The debtor is the Florida East Coast Railway Company, a Florida corporation, which owns a line of railroad between Jacksonville and Miami, Florida, together with terminals, rolling stock, and other assets. The stock of this debtor on seven occasions has been held by the Interstate Commerce Commission to be without value, and no objection has ever been made to any of these findings. The claims ahead of the stock, including the principal and interest of its First Refunding Mortgage bonds, total well in excess of $80,000,000 while all the findings of the value of the assets that would be available toward the satisfaction of those claims fix the value at well under $50,000,000. The only value that this stock has is of an unreal quality, which it derived instantly from the Supreme Court's opinion of April 5, 1954, just as Pallas Athene fully armed stepped out of the head of Zeus.

In his opinion of June 28, 1954, the District Judge failed to recognize this artificial value or disregarded its effect in the Supreme Court, and stated it to be clearly established by the record that this stock had no value, that it had never had any value during the pendency of this proceeding, and that there was no possible equity for stockholders after the payment of proven debts. Later he referred twice to this "worthless stock." The creditors committee, which instituted this proceeding in bankruptcy, alleged that the fair value of the debtor's property was less than the principal and accrued interest on its outstanding bonds. The debtor, in its answer, admitted all of the allegations in the petition, and prayed that it be relieved from any duty under Section 77 to file a plan of reorganization, in view of the fact that the petitioners were filing one. Impliedly conceding that it was the debtor's duty to file a plan, it prayed to be relieved of any such duty, and the court granted this prayer. The order relieved the debtor of the duty to initiate a plan; it was not objected to or appealed from; and no question of its propriety or the jurisdiction of the court to make it was raised by any one.

At the hearing that preceded the order of June 28, 1954, from which this appeal was taken, the appellant offered evidence to show that the debtor had consented to the merger feature of the plan, as well as to its other provisions, and that no forced merger was contemplated by the plan so far as the debtor was concerned, because the latter had concurred in it initially, and had formally adopted it after the Supreme Court's decision. The majority of the Supreme Court thought that the plan would involve the application of force against the Florida East Coast Railway Company, as it spoke of the plan being forced or foisted upon the carrier or corporate entity; and the District Judge was of the opinion that the attempted adoption of the plan came too late, since it was "congenitally defective" and there were "no means of activating it."

The Atlantic Coast Line, on remand, also proffered evidence to show that there had been no change in conditions as a result of which the plan, found to be fair by this court on January 19, 1953, had become unfair by June 21, 1954; it further offered to prove that not merely had there been no change in conditions which had made the plan unfair, but that the trend had been the other way and, if any change had taken place, the plan was fairer than it was when previously approved. The court below refused this proffer of evidence, and dismissed the bankruptcy proceeding on the ground that an unreasonable delay had occurred in the reorganization of the railroad. Thereupon, it ordered a turnover of the debtor's property to an equity receiver in the same court. This is the order that was appealed from and superseded in this case; it adhered to and confirmed the District Court's prior order of March 11, 1952, which had been reversed; it fixed August 1, 1954, at 12:01 A. M., as the effective date of dismissal of the petition for reorganization; and directed John M. Martin, as sole trustee in the reorganization proceeding, to turn over to John M. Martin, as sole equity receiver, all of the debtor's property. The effect of this order would be to eliminate the blended power of the court and the Commission, provided for by Section 77 in the reorganization of insolvent railroad corporations. The history of equity receiverships is not such as to inspire hope of any improvement by the change from bankruptcy to the equity side of the court. In Palmer v. Massachusetts, 308 U.S. 79, at page 86, 60 S.Ct. 34, at page 37, 84 L.Ed. 93, the court said:

"Until the amendment of March 3, 1933, railroads were outside the Bankruptcy Act. But the long history of federal railroad receiverships, with the conflicts they frequently engendered between the federal courts and the public, left an enduring conviction that a railroad was not like an ordinary insolvent estate. Also an insolvent railroad, it was realized, required the oversight of agencies specially charged with the public interest represented by the transportation system. Indeed, when, in the depth of the depression, legislation was deemed urgent to meet the grave crisis confronting the railroads, there was a strong sentiment in Congress to withdraw from the courts control over insolvent railroads and lodge it with the Interstate Commerce Commission. Congress stopped short of this remedy. But the whole scheme of § 77 leaves no doubt that Congress did not mean to grant to the district courts the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates. The judicial process in bankruptcy proceedings under § 77 is, as it were, brigaded with the administrative process of the Commission."

█ Since the United States District courts are courts of law (civil and criminal), equity, admiralty, and bankruptcy, it is ordinarily more logical to shift from an equity receivership to a bankruptcy proceeding than it is to reverse the movement. Courts of equity may enjoin suits at law and keep creditors at bay, but they cannot discharge debts, reduce or adjust them, or otherwise impair the obligations of contracts; but the bankruptcy courts, within the limits of the Fifth Amendment, may do any and all of these things. They are not only courts of equity, but in a proceeding under said Section 77 they have an extraordinary nation-wide jurisdiction in rem, which is a caveat and injunction to all the world not to interfere with the res in bankruptcy. It is, therefore, easy to see why the creditors committee sought relief in bankruptcy after ten fruitless years of an equity receivership, but no sound reason appears why this stale case should be reactivated after lying dormant during the bankruptcy period of almost 14 years. As between bankruptcy and a stale equity receivership, one may ask: "Could you on this

fair mountain leave to feed, and batten on this moor?"

◼ According to Blackstone, a bankrupt was formerly defined as "a trader who secretes himself and does certain other acts tending to defraud his creditors," 2 Bla.Com. 471; but at present the bankruptcy law, especially the federal statutes, are founded on principles of humanity as well as justice; and, to that end, they confer privileges on the debtor that tend toward his rehabilitation, while protecting the substantial rights of his creditors. Everything legislatively possible has been done that could be done to take the odium and hardship out of bankruptcy. In many of the chapters the insolvent persons are not even called bankrupts; they are referred to as debtors; provisions relating to bankrupts are deemed to relate also to debtors. Section 77 deals with the reorganization of insolvent railroads, which are called debtors. Chapter 10 deals with corporate reorganizations, and "debtor" means a corporation by or against which a petition has been filed under the chapter. As an emergency measure, under bankruptcy jurisdiction, farmers could retain possession of their property, while a federal conciliation commissioner sought to win over creditors to a plan for their relief and rehabilitation. In the instant case, the bondholders' committee filed the suit in equity for a receiver, and 10 years later filed the petition under Section 77, which the lower court dismissed. The Florida East Coast Railway Company has done nothing to impede this proceeding.

The advantages in bankruptcy of a sale of assets, free of liens or subject to liens, far outnumber those of selling property in an equity receivership. The latter has been tried and found wanting. New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 1947, 143 F.2d 179. The order appealed from would jettison the services and expert knowledge of the Interstate Commerce Commission, which has worked on this case since 1941 and recommended more than one plan that has been rejected by the lower court.

On a prior appeal, this court held that it was not proper for the District Court to try to wrest the leadership of this reorganization proceeding from the Commission, 201 F.2d 325. In Ecker v. Western Pacific Railroad Corp., 318 U.S. 448, 468, 63 S.Ct. 692, 87 L.Ed. 892, the Supreme Court said that Section 77 manifests the intention of Congress to place reorganizations under the leadership of the Commission, subject to a degree of participation by the court. The bankruptcy court may order a sale of the res in its custody more advantageously than a court of equity is permitted to do it; in truth it is a court of equity with a statutory jurisdiction that ordinary courts of equity do not possess.

◼ Our appellate jurisdiction in this matter is full and complete, Sec. 2106 of Title 28 U.S.Code; but we are confronted with a most extraordinary situation. In Note 12 of the Supreme Court's opinion, it emphasizes the importance of remembering that a railroad in a "§ 77 proceedings is not a defunct organism but remains a live and going concern." It further says: "See the references throughout § 77 to 'the debtor' as an active entity; also Van Schaick v. McCarthy, 10 Cir., 116 F.2d 987, 992–993. During the entire period that the Florida East Coast has been in receivership or trusteeship there have been annual stockholders' meetings at which a Board of Directors was elected. See the Florida East Coast's Annual Reports on file with the Interstate Commerce Commission. Indeed the desire to provide a ready remedy for the overhauling of a railroad's financial structure without impairing its primary responsibilities as a regularly functioning carrier was one of the principal reasons for the enactment of § 77. See 5 Collier, Bankruptcy, § 77.02. Thus it follows from the consistency clause, when viewed in the light of this corporate continuity of a railroad in reorganization, that those who in the absence of § 77 would wield the corporate merger powers must initiate and work out the merger now. Cf. § 77, sub. d, which not only permits but requires the debtor

railroad itself to file a plan of reorganization." 347 U.S. 298, 74 S.Ct. 574, 581.

The trial judge said in his opinion of June 28, 1954, that he was loath to believe that any action taken by the holders of this worthless stock would be of any significance; that the effect of the reorganization proceedings was to eliminate the Florida East Coast Railway Company and its stockholders, at their request, as factors in the preparation or adoption of any reorganization plan. This statement went beyond the terms of the order itself, which relieved the debtor from any duty to file a plan but did not undertake to disqualify the debtor from consenting to a plan or even initiating one; it dealt with what the debtor was under duty to do, not with what it might do.

■ Under the decision of the Supreme Court the District Judge had no alternative but to disapprove the plan since that court had declared it illegal. However, he erred in dismissing the Section 77 proceeding and returning the affairs of the debtor to the equity receivers. Accordingly, the order appealed from is reversed, and the cause remanded to the District Court with directions to take such further action as may not be inconsistent with the opinion of the Supreme Court and this opinion.

HOLMES, Circuit Judge (concurring).

The Supreme Court said that the plan of reorganization was congenitally defective, which means that the defect existed at and from the date of its birth. A congenital defect is not necessarily incurable. The metaphor raises the question as to whether such a plan is born when filed by the parties, recommended by the Commission, approved by the court, assented to by the security holders, or at some other time. This is the latest plan that has been proposed; the others died aborning; it may be that a plan is not born until finally approved by the judicial process, and that it is in the making prior to the consummation of the brigaded powers of the court and the Commission. It is anomalous to speak of a plan as congenitally and irrevocably defective, as if it were a stillborn creature, when the court merely held that it was defective at birth, an imperfect plan.

Accepting the Supreme Court's decision that there cannot be a merger or unification involving force or compulsion against a debtor corporation or its stockholders, the express provisions of the statute make it clear that a consent after the approval of the plan is all that is required. Section 77, sub. d of the Bankruptcy Act explicitly provides that a reorganization "may be different from any [plan] which has been proposed." Section 5(2) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2), expressly provides that when a plan for a unification is submitted to the Commission, the latter may prescribe "such terms and conditions and such modifications as it shall find to be just and reasonable" and that it may approve the plan "upon the terms and conditions, and with the modifications, so found to be just and reasonable". Both statutes clearly contemplate that the Commission may modify unification plans which are submitted to it. Since both statutes authorize the Commission to modify the terms of a proposed merger, and any required consent to a plan that has been modified by the Commission must come after the modification, there is no basis for the suggestion that there must be a consent to any modification in advance of the time when it is made by the Commission. Moreover, the consistency clause of Section 77, sub. f provides that, upon confirmation of a plan, the Commission shall, without further proceedings, grant authority for the issue of any securities, assumptions of obligations, transfer of any property, sale, consolidation or merger of the debtor's property, to the extent contemplated by the plan. It thus expressly contemplates that any proceedings under Section 5 of the Interstate Commerce Act shall take place after confirmation of the plan. The 1935 revision of Section 77 did more than

change the location of the consistency clause; it added the words "upon confirmation of the plan," which are highly pertinent in determining when any action required by the consistency clause must be taken.

In the light of the Supreme Court's self-restricted jurisdiction and the first sentence of its opinion, it was proper for the Atlantic Coast Line to show, on remand for further proceedings in accordance with the court's opinion, that the Florida East Coast Railway Company was not being compelled and would not be compelled to merge with the Atlantic Coast Line. The Supreme Court did not find anything wrong with the plan itself. The defect found by the court, on the record before it, related solely to the part, or the apparent lack of part, that the Florida East Coast Railway Company had taken in the proceedings.

The Supreme Court's decision was not on the merits of the plan except in so far as it related to a forced merger. The opinion of the court of appeals on all other provisions of the plan was not within the scope of the writ of certiorari. It was a decision of the court en banc, and may not be overruled by a division of three judges. Except as to the merger provision, its holding that the plan was a good one is the law of this case. In raising a new point of law, the Supreme Court did not intend to shut out proof upon any issue of fact emerging therefrom. Out of the facts the law arises; and new or additional facts may alter a court's decision.

When the petition for a reorganization in this case was approved by the judge as properly filed and as having been filed in good faith, the old equity receivership became moot and should have been dismissed, because the bankruptcy court immediately was vested with exclusive jurisdiction of the debtor and its property wherever located; and, in addition to the other powers conferred by Section 77, sub. a of the bankruptcy act, the district court was granted all the powers, not inconsistent with said section, which a federal court would have had if it had appointed a receiver in equity of the property of the debtor. Accordingly, it was not necessary or proper for the district court, by a summary order in a moot case, to revive powers that it already possessed in the bankruptcy proceeding. 11 U.S.C.A. § 205, sub. a. The bankruptcy proceeding that was to be dismissed had exclusive jurisdiction of the debtor and its property; the moot equity case had jurisdiction of neither while the bankruptcy proceeding was pending.

RUSSELL, Circuit Judge (concurring specially).

Even casual consideration of the past proceedings and rulings[1] in this matter will reveal grounds for substantial argument as to what is, as often denominated, "the law of the case". However, it would be unusual, to say the least, to attribute to the Supreme Court an intention to abandon determination of the important, if indeed not the controlling, question which had underlain the prior decisions of the trial and the Appellate Courts, and to which alone the Supreme Court had restricted itself upon the grant of certiorari. With much more logic and respect might it be assumed that the court was deciding the case as made and presented with the result that the decision should be construed to hold that the equitable owners of the property supplant in interest the holders of the worthless stock and are thus entitled to the say-so on the question of merger which would ordinarily be enjoyed by

1. In re Florida East Coast Railway Co., D.C., 81 F.Supp. 926, affirmed Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538, certiorari denied 339 U.S. 929, 70 S.Ct. 627, 94 L.Ed. 1349; In re Florida East Coast Railway Co., D.C., 103 F.Supp. 825; Atlantic Coast Line Ry. Co. v. St. Joe Paper Co., 5 Cir., 201 F.2d 325, certiorari granted 345 U.S. 948, 73 S.Ct. 866, 97 L.Ed. 1372, reversed 347 U.S. 298, 74 S.Ct. 574, rehearing denied 347 U.S. 980, 74 S.Ct. 734. See also, In re Florida East Coast Ry. Co., D.C., 49 F.Supp. 527 and In re Florida East Coast Ry. Co., D.C., 52 F.Supp. 420.

the stockholders of a corporation. This view certainly finds abundant support in the unquestioned principle that in bankruptcy creditors are, and always have been, considered the real parties at interest as concerns the property of the bankrupt until their claims are satisfied. In any event, and this I think controlling here, no court, acting on the premise that a "forced merger" was *illegal* (as now determined) has ever held the plan of reorganization promulgated by the Interstate Commerce Commission fair and equitable in the face of the objections of the overwhelming majority in amount of the equitable holders of the property. This feature of the case, if not determined by the Supreme Court as above indicated, is an open question. Clearly, an illegal plan is not fair and equitable. Even if the taint of illegality should be removed, in this case, where this is effected by the acts of those having no interest in the res, and is opposed by the real owners of the property, I should still be of the opinion that such a plan is inherently unfair and should not be approved by the court. The tail of form should not be permitted to wag the dog of substance. In the circumstances here, there is no necessity of doing the vain thing of proceeding further to determine whether the "cramdown" provisions of the statute should be employed. One who buys railroad securities is charged with knowledge that his rights of property are subject to the lien of the "public interest", and therefore subject to be modified when necessary to effectuate that interest, but except for this an owner of railroad securities is entitled to hold and enjoy the incidents of ownership in the same way as is the owner of any other class of property. In this case, it has not been made to appear that the public interest requires the obliteration of private rights.

The trial court properly refused to approve the plan. The matter should have been returned to the Interstate Commerce Commission for the formulation of a fair and lawful plan which would protect both public and private interests.